87 So.2d 516

**J. E. BODDIE**

v.

**J. C. DREWETT et al.**

No. 42317.

March 26, 1956.

Rehearing Denied May 7, 1956.

———◆———

Madison, Madison, Files & Shell, Trousdale & Oliver, Monroe, for plaintiff-appellant.

Barham, Elder & Wright, Ruston, Oliver & Oliver, C. T. Munholland, Monroe, William Greene, Blanchard, Goldstein, Walker & O'Quin, Shreveport, for defendants-appellees.

McCALEB, Justice.

Plaintiff seeks a declaratory judgment recognizing him as owner of the minerals underlying a 12-acre tract of land in the Ruston Oil Field. This tract, which is situated in the extreme southwest corner of Section 17, T. 19 N., R. 2 W., Lincoln Parish, was conveyed on December 5, 1941, to Mrs. Carrie Brock Martin by Ruston State Bank & Trust Company, the latter reserving all of the minerals. Plaintiff purchased these mineral rights from Mrs. Martin on July 18, 1952, on the theory that the mineral servitude created by the bank's mineral reservation had prescribed because of non-usage for ten years.

On March 31, 1949, the Commissioner of Conservation promulgated Order No. 164 pursuant to Act 157 of 1940, R.S. 30:1 et seq., specifying two 640-acre drilling units, one comprising Section 17, T. 19 N., R. 2 W., for the Bodcaw and Vaughn sands and the other covering the West half of Section 17 and the East half of Section 18 for the "D" sand. Both of these units embrace the 12 acres in dispute. The order directed that all wells drilled on the units be located within 330 feet of the center of the unit unless special exceptions be granted. The 12-acre

tract is not within the area designated for the drilling of the wells.

On December 2, 1949, Arkansas-Louisiana Gas Company, having received a permit to drill within the designated area, spudded in a well which proved to be dry. It was plugged and abandoned on March 3, 1950. Reworking operations of this well, which was known as the Josie M. Colvin No. A–1 well, were commenced on December 4, 1950, and were unsuccessful, the well being again plugged and abandoned in January of 1951.

On March 10, 1952, the Commissioner of Conservation issued an "Exception Permit" for the drilling of the Josie M. Colvin No. 2 well at a point 660 feet north of the south line and 660 feet east of the west line of Section 17. In due course, this well, which is located some 400 feet north of the 12 acres in controversy, was completed as a producer of oil and gas from the Bodcaw and Vaughn sands. On September 2, 1952, the Commissioner of Conservation issued another permit for the drilling of the Josie M. Colvin No. 3 well which was completed as a producer of gas from the James Lime formation on October 31, 1952, at a point also about 400 feet north of the 12-acre tract. Subsequent to the completion of this well as a producer, the Commissioner of Conservation issued Order No. 164–A, prescribing rules and regulations for the James Lime Reservoir.

Defendants in the case, who are the transferees by mesne conveyances (and in various capacities) from Ruston State Bank & Trust Company, deny that the servitude created on December 5, 1941, has prescribed. They contend, primarily, that there was a user of the servitude and that the dry hole drilled by their lessee in December of 1949 effected an interruption of the running of prescription, notwithstanding that the drilling was not conducted upon the 12-acre tract which formed part of the unit. They further allege that the order of the Commissioner of Conservation prohibited them from drilling on the land covered by the servitude and that, therefore, the running of prescription was suspended as long as the obstacle was in existence.[1]

Following a trial below, the judge dismissed plaintiff's suit, being of the opinion that the dry hole drilled in the area specified by the order of the Commissioner of Conservation was a user of the servitude which interrupted the running of prescription. Hence this appeal.

We think that the judge erred in maintaining defendants' primary position that prescription was stopped in 1949 by the drilling of the dry hole in the area designated by the order of the Commissioner of Conservation. To use a servitude so as to effect an interruption of prescription is to exercise the right in the manner contemplat-

1. It is to be noted that defendants' claim of suspension, although factually alleged in their answer, was not briefed in this Court but was argued orally after some of the members of the Court suggested that the Commissioner's Order might be an obstacle which prevented the use of the servitude.

ed by the grant or reservation. Louisiana Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1. With respect to a mineral servitude, it is essential that there be exploitation of the land, either by good faith drilling operations thereon, albeit unsuccessful,[2] or by the extraction of the minerals lying under the land by draining or otherwise removing them through operations conducted from outside of the land.[3] It has been many times held that mineral leases are maintained beyond their primary terms by obtaining production in paying quantities from operations on units established by the Commissioner of Conservation embracing the leased tracts even though no drilling is conducted on the tracts themselves.[4] The same result obtains when a servitude is involved for it is plain that an actual use of the minerals occurs when they are extracted from under the land and, hence, it is immaterial whether the operations are conducted on the land burdened by the servitude or from without. Therefore, it cannot be doubted that, since the minerals underlying the 12-acre tract were being withdrawn by the operation of the Josie M. Colvin No. 2 well, which was

dually completed within the drilling unit in the Bodcaw and Vaughn sands on October 1, 1952, such extraction constituted a user of the servitude and the running of prescription was interrupted as of that date, if prescription had not already accrued.

On the other hand, we do not regard the dry hole drilled on the unit in December of 1949 as a user of the servitude as there was neither production from nor drilling on the land burdened therewith. Accordingly, unless the order of the Commissioner of Conservation constituted an obstacle to the user of the servitude which effected a suspension of the running of prescription, plaintiff must prevail.

At the outset, we take cognizance of plaintiff's contention that no question of suspension of prescription is at issue, it being claimed that defendants have not specially pleaded that there was an obstacle preventing their use of the servitude. However, we think that a reading of defendants' answer suffices to dissipate plaintiff's position. In paragraph (h) of Article 3 of the answer, it is specifically stated, inter alia,

2. Lee v. Giauque, 154 La. 491, 97 So. 669; Keebler v. Seubert, 167 La. 901, 120 So. 591 and Hunter v. Ulrich, 200 La. 536, 8 So.2d 531.

3. Ohio Oil Co. v. Kennedy, La.App., 28 So.2d 504, 505, certiorari denied January 24, 1947; Sanders v. Flowers, 218 La. 472, 49 So.2d 858; Smith v. Holt, 223 La. 821, 67 So.2d 93 and Union Oil Co. of California v. Touchet, 229 La. 316, 86 So.2d 50.

4. Hood v. Southern Production Co., 206 La. 642, 19 So.2d 336; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Crichton v. Lee, 209 La. 561, 25 So.2d 229; Hunter v. Shell Oil Co., 211 La. 893, 31 So.2d 10; Hunter Co., Inc., v. Vaughn, 217 La. 459, 46 So.2d 735; Le Blanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855; Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87 and Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615.

that, by reason of Order No. 164 "* * * respondents were prohibited from locating a well on the property involved in this litigation which would permit them to produce gas and condensate from the Bodcaw, Vaughn or 'D' Sand Reservoirs in the Ruston Field * * *". While it is true that defendants erroneously conclude from the facts that their servitude was not lost as prescription was interrupted, the allegations of the answer are adequate to justify a consideration of the question of whether prescription did not accrue as a consequence of its suspension prior to the obtention of production from the tract.

Article 792 of the Civil Code provides:

"If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of nonusage does not run against him as long as this obstacle remains."

A review of the jurisprudence in mineral cases dealing with this Article reveals that, in most instances, the Court has found that the facts pleaded as constituting obstacles were insufficient to support a suspension of the running of prescription.[5] But, when the facts exhibit a real obstacle to the use of the servitude, such as the lawful orders of the Commissioner of Conservation, the codal provision applies and the running of prescription is suspended by operation of law. This was recognized in Hardy v. Union Producing Co., 207 La. 137, 138, 20

5. In the following cases relief was denied on the ground that no obstacle existed to the exercise of the mineral servitude: McDonald v. Richard, 203 La. 155, 13 So.2d 712 (Art. 792 does not permit a landowner to suspend the prescriptive period by selling his so-called reversionary interest in a mineral servitude which he previously imposed upon his land); Deas v. Lane, 202 La. 933, 13 So.2d 270 (the oversale of minerals by a landowner is no obstacle to the exercise of a prior recorded mineral servitude); Gayoso Co. v. Arkansas Natural Gas Corp., 176 La. 333, 145 So. 677 (the lease by a landowner of his reversionary interest in the minerals prior to the expiration of the servitude held no obstacle since the lease did not prevent the mineral owner from using the servitude); Coyle v. North Central Texas Oil Co., 187 La. 238, 174 So. 274 (where there is a purchase of minerals already subject to a mineral lease, the lease is no obstacle to the exercise of the servitude); Gailey v. McFarlain, 194 La. 150, 193 So. 570 (prior recorded mineral lease on land upon which mineral servitude is subsequently created does not constitute an obstacle); Hightower v. Maritzky, 194 La. 998, 195 So. 518 (held no obstacle where landowner in selling minerals reserved the power to lease and the right to receive bonus and delay rentals therefor); Perkins v. Long-Bell Petroleum Co., 227 La. 1044, 81 So.2d 389 (filing of jactitation suit by landowner no obstacle to use of servitude since mineral owner always had free access to the land for exploration purposes). But see White v. Hodges, 201 La. 1, 9 So.2d 433, holding that an oversale of minerals by a landowner became a mineral servitude on the date on which liberative prescription returned the minerals to the owner and that the existing servitude operated as an obstacle to the running of prescription on the after-acquired servitude.

So.2d 734, 737,[6] and more recently in Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615, 620.[7]

In the case at bar, we think it evident that the order of the Commissioner of Conservation of March 31, 1949, imposed an effective obstacle to the use of the servitude. It provided that every well upon the drilling units was to be located not more than 330 feet from the center of each unit and that not more than one well on each unit would be allowed to produce from the "D" sand or the Vaughn and Bodcaw sands. Thus, drilling operations on the 12-acre tract were prohibited by the order which, being based on geophysical and scientific findings and entered for the purpose of avoiding waste and preventing the unnecessary drilling of wells, was a valid conservation measure authorized by the Constitution and laws of this State. Article VI, § 1 of the Constitution and R.S. 30:1–30:20.

Counsel for plaintiff, nevertheless insisting that an obstacle did not exist in fact, declare that the best evidence of this is that two producing wells, Josie M. Colvin Nos. 2 and 3, were drilled a few hundred feet north of the 12-acre tract subsequent to the issuance of Order No. 164.

This proposition is not sound. The fact that wells were drilled in other areas after the abandonment of Josie M. Colvin No. A–1 under exception permits issued by the Conservation Commissioner (either with or without a hearing) affords no ground for holding that the obstacle did not exist but only that it was subject to removal following the unsuccessful exploration in the area designated by Order No. 164. Indeed, we think it apparent that there was nothing to prevent the resumption of the running of prescription within a reasonable time after the abandonment of the first well as the failure of production opened the door to the initiation of proceedings for the allowance of drilling in areas theretofore prohibited by the order. Hence, in determining whether prescription has accrued, it is appropriate to conclude that it was suspended for a period of at least 336 days, that is, from March 31, 1949 (the date Order No. 164 was promulgated) until March 3, 1950 (when

6. It was there stated: "In other words, the right of defendants to drill a well on the 47-acre tract covered by the lease was in effect taken away from them by the orders of the Commissioner of Conservation, with, however, the right reserved to them, as well as to the plaintiffs, to share in the production of the gas produced from the unit in proportion to their ownership. Defendants' hands were literally tied as a result of the orders issued by the Commissioner of Conservation and they could do nothing whatsoever to prevent the primary term of the lease from expiring without drilling a well thereon."

7. It was said: "In fact, another well could not have been drilled on this same unit without specific authorization, as secured in this case, i. e., by obtaining an order from the Commissioner of Conservation, following a full hearing and based upon his findings, warranting such exception to basic Order No. 96. It necessarily follows that the lease did not terminate for failure to pay rentals".

Josie M. Colvin No. A-1 well was first plugged and abandoned).

Counsel for plaintiff also profess that defendants could have prevented the existence of the obstacle by opposing the application of Arkansas-Louisiana Gas Company for the formation of drilling units.

This argument does not impress us as it would require the adoption of an inflexible and unrealistic view of the entire conservation program of this State. Manifestly, it would be unreasonable to exact token opposition to a unitization order of the Commissioner of Conservation as a condition precedent to the preservation of a servitude owner's right to plead suspension of prescription by reason of the obstacle created by the order.

Counsel further take the position that defendants have failed to prove that they could not have removed the obstacle by obtaining an exception to the order of the Commissioner of Conservation respecting the drilling operations.

This point likewise appears to be without merit in view of Section VII of the original order, pertaining to special exceptions and hearings. It declares:

"If any party of interest can show that any part of this order, as applies to his interest, will result in waste or is unreasonable, the Commissioner of Conservation may enter such an order, as a special exception to the provisions of this order, as will prevent waste or eliminate such unreasonable restraint, after due notice and hearing."

It is difficult to perceive upon what basis defendants would have been able to show that the Commissioner's order, which was founded on the best available geophysical data for recovery of production from proven sands, would result in waste or was unreasonable. The law does not require anyone to pursue a useless course or to initiate groundless proceedings.

Counsel have submitted a supplemental brief in which they assert that, in any event, the obstacle existed for a period of not more than 128 days.[8] By adding the 128 days to December 5, 1951 (the date prescription would normally have accrued) it is concluded that the servitude prescribed on April 12, 1952, or eight days prior to the commencement of the drilling of Josie M. Colvin No. 2, which was subsequently brought in as a producer.

This contention is not tenable. It is predicated on the faulty premise that the obstacle did not come into being until operations were commenced on the first well drilled under the order of the Commissioner. It was not the drilling of the well that created the obstacle but, rather, the order of the Commissioner fixing the area for the drilling of

---

8. Calculated by adding the 91 days intervening between December 2, 1949 (when drilling commenced on Josie M. Colvin No. A-1) and March 3, 1950 (when this well was plugged and abandoned) to the 37 days intervening between December 4, 1950 and January 11, 1951 (the period during which the well was reworked).

wells and prohibiting exploitation for minerals in any other part of the units. As we have heretofore stated, this obstacle remained in existence at least until March 3, 1950, when the Josie M. Colvin No. A–1 well was first plugged and abandoned, a period of 336 days, thus extending the life of the servitude well beyond the time when prescription was interrupted by the completion of Josie M. Colvin No. 2 well as a producer from the Bodcaw and Vaughn sands.

The judgment appealed from is affirmed.

FOURNET, C. J., and PONDER, HAMITER and SIMON, JJ., concur in the decree.